No. 24-1608

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ENBRIDGE ENERGY, LIMITED PARTNERSHIP; ENBRIDGE ENERGY
COMPANY, INC., and ENBRIDGE ENERGY PARTNERS, L.P.,

      Plaintiffs-Appellees,

v.

GRETCHEN WHITMER, the Governor of the State of Michigan in her official
capacity, and SCOTT BOWEN, Director of the Michigan Department of Natural
Resources, in his official capacity,

      Defendants-Appellants.

Appeal from the United States District Court
Western District of Michigan, Southern Division
Honorable Robert J. Jonker

**BRIEF OF *AMICI CURIAE* FOR LOVE OF WATER AND GREAT LAKES
BUSINESS NETWORK IN SUPPORT OF DEFENDANTS**

James M. Olson
*Counsel of Record*

FOR LOVE OF WATER
440 West Front Street
Suite 100
Traverse City, MI 49684
(231) 944-1568
olson@envlaw.com

Andy Buchsbaum
*Counsel of Record*

GREAT LAKES BUSINESS
NETWORK
Buchsbaum & Associates LLC
1715 David Court
Ann Arbor, MI 48105
(734) 717-3665
buchsbauma@gmail.com

# TABLE OF CONTENTS

**STATEMENT OF INTEREST OF *AMICI CURIAE*** ...........................................1

**INTRODUCTION AND SUMMARY OF ARGUMENT**....................................1

**ARGUMENT** ...................................................................................................3

**I.     Defendants' revocation of Enbridge's Line 5 easement was a valid exercise of state sovereignty and public trust responsibility to protect the public's interest in Lake Michigan bottomlands.** .................................................3

A.     Michigan's title to and public trust responsibility for submerged lands at the Straits of Mackinac comprise an indivisible "essential attribute" of state sovereignty. ...........................................................................................3

B.     States' stewardship responsibility for lands subject to public trust is so strong that they have the right to revoke conveyances that violate the public trust. ...............................................................................................................8

C.     Michigan has fully embraced its sovereign public trust rights and responsibilities with respect to Great Lakes bottomlands owned by the State. ...11

**II.     Michigan and its Officials have Eleventh Amendment immunity because Enbridge's Complaint directly challenges both the** ...........................................14

**III.    CONCLUSION**.........................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Accord Keefe v. Clark*, 322 U.S. 393 (1944)............................................................11

*Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641(6th Cir. 2015).........................20

*Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Company, Inc.*, 626 F.Supp.3d 1030 (W.D. Wis. 2022) ................................................................................................................................4

*Cf. Barton v. Summers*, 293 F.3d 944 (6th Cir. 2002)............................................21

*Glass v. Goeckel*, 703 N.W.2d 58, 63-66 (Mich. 2005) ...........................................2

*Hardin v. Jordan*, 140 U.S. 371 (1891)....................................................................5

*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997).........................passim

*Idaho v. United States*, 533 U.S. 262 (2001)...........................................................17

*Kootenai Envt'l Alliance, Inc. v. Panhandle Yacht Club, Inc.*, 671 P.2d 1085 (Idaho 1983) ...............................................................................................................10

*Martin* v. *Lessee of Waddell*, 41 U.S. 367 (1842) ....................................................4

*Michigan v. United States Army Corps of Eng'rs*, 667 F.3d 765  (7th Cir. 2011) ....5

*Nat'l Audubon Soc'y v. Superior Court*, 658 P.2d 709 (Cal. 1983) .....................9, 10

*Nedtweg v Wallace*, 208 N.W  (Mich. 1926) ..........................................................12

*Nessel v. Enbridge Energy L.P.*, 104 F.4th 9585 (6th Cir. 2024)...........................19

*Obrecht v. Nat'l Gypsum Co.*, 105 N.W.2d 143 (Mich. 1960) ...................12, 13, 14

*Owsichek v. Alaska State Guide Lic. and Control Bd.,* 763 P.2d 488 (Alaska 1988) ................................................................................................................................10

*Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469 (1988)................................4, 9

*Pollard's Lessee v. Hagan*, 44 U.S.) 212 (1845)......................................................4

*PPL Montana, LLC v. Montana*, 565 U.S. 576 (2012) ...........................................11

*Shively v Bowlby*, 152 U.S. 1 (1984) .....................................................................4, 5

*Smith v. New York,* 545 N.Y.S.2d 203 (N.Y. App. Div. 1989) ..............................10

*United States v. Alaska,* 521 U.S. 1 (1997) .............................................................8

*United States v. Winstar Corp*., 518 U.S. 839 (1996) ..............................................9

*Utah Div. of State Lands* v. *United States*, 482 U.S. 193 (1987) ............................7

*Utah v. United States*, 403 U.S. 9  (1971) .................................................................4

*Vermont v. Central Vermont Ry*., 571 A.2d 1128 (Vt. 1989)..................................10

## Statutes

33 C.F.R. § 165.944...................................................................................................3

43 U.S.C. § 1301 *et seq.* ..........................................................................................19

MICH. COMP. LAWS § 324.1701 *et seq*..................................................................12

MICH. COMP. LAWS § 324.32501 .........................................................................13

MICH. COMP. LAWS § 324.32501 *et seq*..............................................................12

## Constitutional Provisions

MICH. CONST., art. IV, § 52 ..................................................................................11

## Other Authorities

Black's Law Dictionary  (7th ed. 1999) ....................................................................9

Dave Bartkowiak, Jr*., Michigan's Beer Industry Chugs Along: $9.9 Billion to State's Economy* ......................................................................................................4

Expert Report of Neil K. Earnest at 12, *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Company, Inc.*, 626 F.Supp.3d 1030 (W.D. Wis. 2022) (No. 19-CV-602-WMC). ...............4

*Likely Market Shutdown Responses to a Shutdown of Line 5,* PLG Consulting, October 2023  https://plgconsulting.com/white-paper-likely-market-responses-to-a-line-5-shutdown/ ............................................................................................4

Mich. Sea Grant, *The Dynamic Great Lakes Economy, Employment Trends from 2009 to 2018*,  (Oct. 2020), https://www.michiganseagrant.org/wp-content/uploads/2020/10/MICHU-20-715-Great-Lakes-Jobs-Report-fact-sheet.pdf. ............................................................................................................3

Michael C. Blumm & Lynn S. Schaffer, *Federal Public Trust Doctrine: Misinterpreting Justice Kennedy and Illinois Central Railroad*, 45 ENVTL. L. 399................................................................................................................8

U.S. Bureau of Economic Analysis, 2020 – Michigan, Outdoor Recreation Satellite Account (ORSA), https://outdoorindustry.org/wp-content/uploads/2015/03/ORSA-Michigan.pdf (last visited Feb. 10, 2022). ........3

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

For Love of Water ("FLOW") is a Michigan non-profit law and policy center whose mission is "to ensure the waters of the Great Lakes Basin are healthy, public, and protected for all."[2] FLOW has expertise in Michigan's public trust doctrine and regularly advocates for the protection of the public's rights in and uses of navigable waters and submerged lands throughout the Great Lakes. The lakes are an extraordinary natural resource, containing 21 percent of all fresh surface water in the world and 84 percent of all fresh surface water in North America.[3] Located at the heart of this globally unique freshwater system, at the confluence of Lake Michigan and Lake Huron, are the Straits of Mackinac, where Enbridge's submerged and obsolete 71-year old dual pipelines transit up to 540,000 barrels of crude oil and natural gas liquids daily.[4] FLOW submits this *amicus* brief in support of the Defendants to inform the Court about the state of Michigan's robust public trust rights and responsibilities that protect its sovereign interest and the public rights of

---

[1] No party or its counsel authored any part of this brief or contributed money to support its preparation or submission. No person other than FLOW or the Business Network contributed money to prepare or submit this brief. Neither party objects to the filing of this amicus brief.

[2] *Mission, Vision & Operating Principles,* FLOW, https://forloveofwater.org/about-us/mission-and-goals/ (last visited Oct. 5, 2024).

[3] *Great Lakes Facts and Figures*, U.S. EPA, https://www.epa.gov/greatlakes/great-lakes-facts-and-figures (last updated Nov. 2, 2023).

[4] *Overview*, MICHIGAN DEPARTMENT OF ENVIRONMENT, GREAT LAKES, AND ENERGY, https://www.michigan.gov/egle/about/featured/line5/overview (last visited Oct. 5, 2024).

its citizens in their waters and submerged lands, and the application of the U.S. Supreme Court's principles of state sovereign immunity announced in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997), which bar Enbridge's federal court action. As a research and advocacy organization committed to protection of the precious water resources of the Great Lakes, FLOW brings a unique perspective to the questions now before the Court.

The Great Lakes Business Network is an unincorporated association of over 200 prominent businesses and business leaders in the Great Lakes region. The Business Network strives for "thriving ecosystems, economies, and communities" in the Great Lakes region.[5] The Network includes businesses across a broad range of sectors, many of them leaders in their fields, including Patagonia, Cherry Republic, Bell's Brewery, Short's Brewing Company, Keweenaw Mountain Lodge, and Shepler's Ferry. Several, including Shepler's Ferry, are wholly dependent on Great Lakes navigation. Each member business depends on the reputation of the Great Lakes as healthy and beautiful lakes.

The Business Network is deeply concerned about a looming rupture of Enbridge's failing Line 5 pipeline at the Straits of Mackinac. An oil spill would gravely injure the businesses and communities that depend on Great Lakes water,

---

[5] Great Lakes Bus. Network, *About Us: Mission* https://glbusinessnetwork.com/about-us/ (last visited Oct. 5, 2024).

recreation and navigation. The Network's member businesses rely on unimpaired navigation, from ferries to kayaks to freighters supplying goods, all of which would be decimated by an oil spill. Indeed, navigation is already hampered by measures the Coast Guard has needed to take to prevent ships' anchors from shearing Enbridge's exposed pipeline.[6] These businesses also rely on tourist-producing, public trust-protected recreation—swimming, fishing, boating, walking the beach—that would be destroyed by an oil spill. Thus, the Business Network supports Michigan's exercise of its public trust powers to put an end to that threat.

The Business Network's members are not alone in dependence on the health and accessibility of the Great Lakes. In 2020, outdoor recreation in Michigan accounted for 108,673 jobs, with wages totaling $4.6 billion and $9.5 billion value added to the Michigan GDP.[7]  In 2014, "over 113 million visitors spent over $22 billion in Michigan alone" visiting the Great Lakes.[8] The craft beer industry—in which many Business Network members participate and lead—supports 66,900 jobs

---

[6] U.S. Coast Guard Regulated Navigation Area; Straits of Mackinac, 83 Fed. Reg. 49283 (Oct. 1, 2018) (codified at 33 C.F.R. § 165.944).

[7] U.S. Bureau of Economic Analysis, 2020 – Michigan, Outdoor Recreation Satellite Account (ORSA), OUTDOOR INDUSTRY ASS'N., https://outdoorindustry.org/wp-content/uploads/2015/03/ORSA-Michigan.pdf.

[8] Mich. Sea Grant, *The Dynamic Great Lakes Economy, Employment Trends from 2009 to 2018*, (Oct. 2020), https://www.michiganseagrant.org/wp-content/uploads/2020/10/MICHU-20-715-Great-Lakes-Jobs-Report-fact-sheet.pdf.

in Michigan and contributes more than $9.9 billion to the state's economy.[9] A

Michigan Technological University study concluded that a Line 5 rupture in the

Straits could result in at least $1.878 billion in economic damages.[10] Like FLOW,

the Business Network opposes Enbridge's litigation efforts to strip Michigan of its

public trust rights and responsibilities to protect the ecological and economic health

of the Great Lakes.[11]

---

[9] Dave Bartkowiak, Jr., *Michigan's Beer Industry Chugs Along: $9.9 Billion to State's Economy,* Click on Detroit (July 9, 2021), https://www.clickondetroit.com/features/2021/07/09/michigans-beer-industry-chugs-along-99-billion-to-states-economy/#//.

[10] *See* Mich. Tech. Inst., *Independent Risk Analysis for Straits Pipelines, Final* (Sept. 15, 2018), https://hazmaton.org/wp-content/uploads/2022/01/Straits_Independent_Risk_Analysis_Final-1-1.pdf

[11] Business Network members are business realists, with responsibilities to their employees, investors and customers. Reliable energy supplies and reasonable energy prices are important to their success. The Business Network has closely studied the potential impact of a Line 5 shutdown on energy supplies, costs and jobs for their own members and the overall economy, and is firmly convinced that the doomsday predictions by Enbridge and its allies are highly exaggerated and inconsistent. For example, Enbridge's own expert has testified in federal court that a Line 5 shutdown will increase gasoline prices by no more than half a cent to a cent per gallon. Expert Report of Neil K. Earnest at 12, *Bad River Band v. Enbridge*, 626 F. Supp. 3d 1030 (W.D. Wis. 2022) (No. 19-CV-602-WMC, dkt item 262). And a recent report by PLG Consulting, a respected industry analyst, likewise concludes that the energy markets would adapt efficiently in replacing both the crude oil and natural gas liquids (including propane) presently conveyed by Line 5. *Likely Market Shutdown Responses to a Shutdown of Line 5,* PLG CONSULTING, October 2023 at 13, https://plgconsulting.com/white-paper-likely-market-responses-to-a-line-5-shutdown/.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Enbridge's prayer for injunctive relief against Defendants ("Michigan Officials") is barred by the Eleventh Amendment because it strikes at an essential attribute of state sovereignty: inalienable sovereign title to and control of submerged lands perpetually infused with the public trust. The State's title cannot be divorced from its public trust obligations that are tied to the land—the United States Supreme Court and the Michigan Supreme Court have long affirmed that the two are inextricably intertwined. By seeking to separate and foreclose the operation of Michigan's public trust doctrine from the State's sovereign title with respect to the Straits of Mackinac, Enbridge's lawsuit is indeed the "functional equivalent" of an action to quiet title and accordingly is barred by the Supreme Court's decision in *Idaho v. Coeur d'Alene,* 521 U.S. 261 (1997).

The District Court got it wrong in declaring that Enbridge's challenge to Defendants' exercise of the state's public trust rights and responsibilities protecting the Straits of Mackinac is not akin to the attack on state sovereignty and control over submerged lands in *Coeur d'Alene*. To the contrary, no reasonable construction of the Complaint exists that does not implicate an immediate and substantial impact on Michigan's jurisdictional and sovereign control over its public trust submerged lands occupied by the Straits Pipelines. The District Court concluded otherwise because it isolated the state's bare title from the state's public trust rights and responsibilities.

1

But this strained and unnatural separation of sovereign title from the public trust cannot be squared with the leading Supreme Court decisions establishing the public trust doctrine together with sovereign title as an essential attribute of state sovereignty.

In its landmark decision in *Illinois Central R.R. Co. v. Illinois*, 146 U.S. 387 (1892), the Supreme Court held that a state's public trust responsibilities with respect to submerged lands are so entwined with sovereignty that it has the power, indeed the duty, to revoke a conveyance of interests in those lands that impairs public trust interests, including navigation. Michigan's leading decision on the public trust doctrine, *Glass v. Goeckel*, 703 N.W.2d 58, 63-66 (Mich. 2005), makes clear that the state's embrace of public trust principles is long-standing and robust, which is unsurprising given Michigan's abundance of freshwater resources.

As one of the "sworn guardians" of Michigan's public trust responsibilities, the state's executive branch had not only the authority but duty to revoke Enbridge's Line 5 easement at the bottomlands crossing the Straits of Mackinac.[12] In

---

[12] On November 13, 2020, Michigan Officials revoked and terminated the 1953 Easement ("Easement") authorizing the construction and operation of the Straits Pipelines. See Notice of Revocation and Termination, attached as Ex. 1 to the Complaint. (R. 1-1, PageID# 22–41). The Notice recites the history of the public trust doctrine in Michigan, details the state's comprehensive factual investigation of the Straits Pipelines, and explains the bases for the determination that the grant of Easement violated the state's public trust requirements when granted in 1953 and violates the public trust today.

determining that the 1953 grant of easement violated the state's public trust requirements, the Michigan Officials acted well within their constitutional and public trust authority. While the merits of the Notice of Revocation and Termination are not at issue here, it is clear that Enbridge's lawsuit would divest the state of *all* sovereign and regulatory control of Lake Michigan's trust bottomlands occupied by Line 5, leaving the state with bare title but no authority to exercise its public trust rights and responsibilities to protect navigation and other public uses alienated or impaired by Line 5.

This Court should reject Enbridge's resort to the federal judiciary for an injunction that would forever isolate from state jurisdiction and control submerged lands historically held to be the sovereign responsibility of the states. Since Enbridge's lawsuit attacks an essential attribute of state sovereignty, it falls squarely within the exception to the *Ex parte Young* doctrine announced in *Coeur d'Alene*, and must be dismissed.

## ARGUMENT

I.  **Defendants' revocation of Enbridge's Line 5 easement was a valid exercise of state sovereignty and public trust responsibility to protect the public's interest in Lake Michigan bottomlands.**

   A.  **Michigan's title to and public trust responsibility for submerged lands at the Straits of Mackinac comprise an indivisible "essential attribute" of state sovereignty.**

Michigan's sovereign title to and perpetual public trust responsibility for the bottomlands of Lake Michigan within its boundaries are grounded in two venerable and intertwined doctrines—the equal footing and public trust doctrines. The sovereign rights and responsibilities that flow from those doctrines comprise an indivisible and essential attribute of state sovereignty. At Independence the people of the colonies "became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government." *Martin* v. *Lessee of Waddell*, 41 U.S. 367, 410 (1842) ;*Shively v Bowlby*, 152 U.S. 1, 57-58 (1984) (holding that after the America Revolution, this sovereign title was "charged with a like trust" and vested in the original states" and "absolutely in new states on their admission to the United States."). Under the equal footing doctrine, each new state that joined the Union did so on a full "equal footing" with the original thirteen states. *Pollard's Lessee v. Hagan*, 44 U.S.) 212, 230 (1845); *see also Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 473-76 (1988); *Utah v. United States*, 403 U.S. 9, 10 (1971). Upon statehood Michigan acquired exclusive title to and control of the navigable waters and submerged lands within its borders.

Thus, along with state sovereign title came the rights and responsibilities of public trust, a doctrine as old as the common law itself. *See Coeur d'Alene* 521 U.S.

at 284 (reviewing the doctrine's ancient origins). Early Supreme Court decisions established that tidal lands along the Atlantic Coast are not only owned exclusively by the states as sovereigns, but are also held in trust for the benefit of their citizens, so that they may engage freely in navigation, commerce and fishing. *Shively v. Bowlby*, 152 U.S. 1, 11, 57-58 (1894) (reviewing early cases). With the nation's expansion into the continental interior, the public trust doctrine was readily held to embrace all navigable lakes, rivers and streams and their underlying beds, and in particular the Great Lakes. *See Hardin v. Jordan*, 140 U.S. 371, 382 (1891) ("The right of the States to regulate and control [submerged lands] has been extended to our great navigable lakes, which are treated as inland seas."); *cf. Michigan v. United States Army Corps of Eng'rs*, 667 F.3d 765, 799 (7th Cir. 2011) (describing the Great Lakes as "one of the most precious freshwater ecosystems in the world.").

In *Illinois Central R.R. Co. v. Illinois*, 146 U.S. 387 (1892), the Supreme Court made clear that the inseparability of state sovereign title to submerged lands and the public trust obligations pertaining to such lands applies with full force in the context of the Great Lakes. In 1869, the Illinois legislature granted Illinois Central fee simple title to over 1,000 acres of submerged land extending into Lake Michigan about one mile from Chicago's shoreline (Chicago's "outer harbor") and authorized the railroad to fill and operate a rail line over the property. *Id*. at 444. Years later, after

the railroad had improved the property and commenced operations, the legislature repealed the enabling legislation and revoked the original grant. *Id*. at 449.

The Supreme Court rejected the railroad's challenge to Illinois's action. Three critical and interrelated tenets underpin the Court's decision. *First*, states' sovereign title to submerged lands and their public trust obligations are deeply intertwined: "The State holds the title to the lands under the navigable waters . . . in trust for the people of the state, that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties." *Id*. at 452. Public trust duties are so integral to state sovereignty that the Court analogized them to the state's police powers: "[T]he state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils . . . than it can abdicate its police powers." *Id*. at 453. *Second*, an interest in sovereign lands impressed with the public trust can be conveyed only if one of two conditions can be demonstrated: "where the parcels are used in the improvement of the interest thus held, or when the parcels can be disposed of without detriment to the public interest in the land and waters remaining." *Id*. at 460. Absent such a demonstration, a conveyance of lands subject to the public trust is void at inception and voidable by the state. *Id*. at 453-54.

*Third*, even where a conveyance of submerged lands satisfies this public trust standard, submerged lands never lose their public trust character and the state can

never alienate or cede its sovereign control, such that transfers that violate the public trust can and must be revoked. "The trust devolving upon the State for the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property." *Id*. at 452. Title and the public trust are so intertwined that the trust retains its force even years following a conveyance because the public's perpetual interest in their submerged lands is an essential "incident to their sovereignty." *Id.* at 459-60.

More than a century after *Illinois Central*, the Supreme Court reaffirmed that the states' sovereign title to the bottomlands beneath navigable waters and their public trust responsibilities are inextricably intertwined. In *Coeur d'Alene*, the Court observed that "[l]ands underlying navigable waters have historically been considered sovereign lands" and state ownership thereof "has been considered an essential attribute of sovereignty." 521 U.S. at 283 (cleaned up) (citing *Utah Div. of State Lands* v. *United States*, 482 U.S. 193, 195-98 (1987). In a sweeping review of the history of the public trust doctrine in this country, the Court observed that "[a]ll these developments in American law are a natural outgrowth of the perceived public character of submerged lands, a perception which underlies and informs the principle that *these lands are tied in a unique way to sovereignty*." *Id.* at 286 (emphasis added). *See also United States v. Alaska,* 521 U.S. 1, 5 (1997) (affirming that state

7

ownership of submerged lands held in public trust is "an essential attribute of sovereignty").

Echoing *Illinois Central*, the Court in *Coeur d'Alene* made clear that because navigable waters and their submerged lands are "infused with public trust" they "implicate [a state's] sovereign interest." *Id*. at 283.  *See also* Michael C. Blumm & Lynn S. Schaffer, *Federal Public Trust Doctrine: Misinterpreting Justice Kennedy and Illinois Central Railroad*, 45 ENVTL. L. 399, 401 n.10, 419-21 (2015) (discussing federal and state cases that demonstrate "widespread judicial recognition that the public trust doctrine is inherent in sovereignty"). Supreme Court jurisprudence is clear—a state's exercise of its public trust rights and responsibilities with respect to its sovereign submerged lands is the exercise of an essential attribute of state sovereignty that is inextricably bound up with sovereign title.

### B. States' stewardship responsibility for lands subject to public trust is so strong that they have the right to revoke conveyances that violate the public trust.

In *Illinois Central*, the Supreme Court established that a state has the power, indeed the obligation, to revoke a conveyance to private parties of a property interest in public trust waters and bottomlands if the state determines that the conveyance violated the public trust. 146 U.S. 453-55.[13] The power to revoke is not diminished

---

[13] A "conveyance" of property is not limited to a grant of fee simple title, as in *Illinois Central*, but also includes a grant of a property interest that confers upon the grantee

by either the passage of time or the grantee's investment in improvements to the conveyed property. This is so because the state never relinquishes, can never relinquish its sovereign interests in or responsibility for lands subject to the public trust. *Id.* at 453. "There can be no irrepealable contract in a conveyance of property by a grantor in disregard of a public trust, under which he was bound to hold and manage it." *Id.* at 460; *see also Phillips Petroleum*, 484 U.S. at 494 (1988) (O'Connor, J., dissenting) (citing *Illinois Central* for the proposition that "[t]o the extent that the conveyances to private parties purported to include public trust lands, the States may strike them down, if state law permits"). And under the reserved powers doctrine, "a state government may not contract away 'an essential attribute of its sovereignty.'" *United States v. Winstar Corp*., 518 U.S. 839, 888 (1996).

The power to revoke articulated in *Illinois Central* was applied more recently in *Nat'l Audubon Soc'y v. Superior Court*, 658 P.2d 709 (Cal. 1983). There, the California Supreme Court held that a state water board had the power to revoke, if necessary, longstanding permits granting water rights to the City of Los Angeles that adversely impacted public trust interests. *Id.* at 728. After examining the history of the public trust doctrine, the California Supreme Court affirmed that "the continuing power of the state as administrator of the public trust . . . extends to the revocation

---

a right to control the property or enjoy the exclusive use thereof, such as an easement. See Black's Law Dictionary 334-35, 527 (7th ed. 1999) (defining conveyance and easement).

of previously granted rights or to the enforcement of the trust against lands long thought free of the trust." *Id*. at 723. Other states have recognized that the power to revoke is essential to the administration of state public trust obligations. *See Smith v. New York,* 545 N.Y.S.2d 203, 205 (N.Y. App. Div. 1989) (holding that a conveyed interest in submerged lands "may be revoked by the State when the uses proposed are not in conformity with the public trust doctrine"); *Vermont v. Central Vermont Ry.*, 571 A.2d 1128, 1132-33 (Vt. 1989) (affirming in dicta the state's power to revoke previously granted property rights, citing *Illinois Central*); *Owsichek v. Alaska State Guide Lic. and Control Bd.,* 763 P.2d 488, 496 (Alaska 1988) (declaring as void "exclusive guide areas" licenses previously granted by the state as violating the common use clause of the Alaska Constitution, which incorporates the state's public trust doctrine).

A state may exercise its revocation power not only if it determines that the original conveyance violated the public trust when made, as in *Illinois Central*, but also in response to changed conditions post conveyance. *See, e.g., Nat'l Audubon Soc'y*, 658 P.2d at 728 (holding that "the state is not confined by past [water] allocation decisions which may be incorrect in light of current knowledge or inconsistent with current needs"); *Kootenai Envt'l Alliance, Inc. v. Panhandle Yacht Club, Inc.*, 671 P.2d 1085, 1094 (Idaho 1983) (holding that the state is not precluded from determining that a conveyance "is no longer compatible with the public trust").

10

Denial or impairment of the state's power to revoke a conveyance that violates the public trust would eviscerate the public trust doctrine and the states' right to exercise an essential attribute of state sovereignty. *Accord Keefe v. Clark*, 322 U.S. 393, 397 (1944) ("The continued existence of a government would be of no great value, if, by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation."). As stated in *Illinois Central*, 146 U.S. at 460, public trust bottomlands "cannot be placed entirely beyond the direction and control of the state."

### C. Michigan has fully embraced its sovereign public trust rights and responsibilities with respect to Great Lakes bottomlands owned by the State.

While Supreme Court cases show that the entwined equal footing and public trust doctrines have origins reaching back to our Nation's founding, the Court has made clear that the precise contours of the public trust doctrine are for each state to determine in its sovereign capacity. *See PPL Montana, LLC v. Montana*, 565 U.S. 576, 604 (2012). Michigan's fidelity to the public trust doctrine is as robust as that of any state. The Michigan Constitution declares that the conservation and development of the state's natural resources are "of paramount public concern." MICH. CONST., art. IV, § 52. In furtherance thereof the Michigan Legislature has enacted two signature statutes implementing the state's public trust doctrine: the Michigan Environmental Protection Act, 1970 P.A. 127, MICH. COMP. LAWS §

324.1701 *et seq*.; and the Great Lakes Submerged Lands Act, 1955 P.A. 247, MICH. COMP. LAWS § 324.32501 *et seq*. And the Michigan Supreme Court has declared that the state judiciary, "equally with the legislative and executive departments, is one of the sworn guardians of Michigan's duty and responsibility as trustee of the above delineated beds of 5 Great Lakes." *Obrecht v. Nat'l Gypsum Co.*, 105 N.W.2d 143, 148 (Mich. 1960).

The inseparable connection between Michigan's sovereign title and the state's public trust rights and responsibilities is firmly rooted in the principles enunciated in *Illinois Central,* and long before the circumstances alleged in Enbridge's Complaint. *See Glass v. Goeckel*, 703 N.W.2d 58 at 63-66 (examining in detail the history of the public trust doctrine in Michigan and declaring that "the state, as sovereign, has an obligation to protect and preserve the waters of the Great Lakes and the lands beneath them for the public."); *see also Collins v. Gerhardt*, 211 N.W. 115, 118 (Mich. 1926) (holding that the state, as sovereign, holds title to and control of the waters and bottomlands of the Great Lakes within its boundaries in a "high, solemn, and perpetual trust, which is the duty of the state to forever maintain."); *Nedtweg v Wallace*, 208 N.W  (Mich. 1926) (same); *State v Venice of America Land Co.*, 125 N.W. 770 (1910) (same); *State v Lake St. Clair Fishing & Shooting Club*, 87 N.W. 117 (1901) (same). For well over a century, the Michigan

Supreme Court has repeatedly affirmed the inseparability of the public trust doctrine and the state's sovereign title to the bottomlands of Lake Michigan.

That inseparability is reflected in several important principles that guide the state's administration of its sovereign interests and public trust rights and responsibilities. *First*, the state cannot convey an interest in submerged trust lands unless the state makes a determination, set forth in a "due finding" in "recorded form," that there is an "exceptional reason" for the conveyance that conforms to the public trust. *Obrecht*, 105 N.W.2d at 149; *see also* Great Lakes Submerged Lands Act, MICH. COMP. LAWS § 324.32501 (codifying the common law "due finding" requirement). Without the requisite public trust findings, such a conveyance is void from inception and "becomes an unlawful detention of state property." *Obrecht*, 105 N.W.2d at 149-50. *Second*, a conveyance of an interest in public trust lands that meets the state's strict requirements nonetheless remains forever subject to the public trust doctrine and cannot result in private control or use that alienates or impairs public trust uses. *See Glass v. Goeckel*, 703 N.W.2d at 65 (the state can never "relinquish [its] duty to preserve public rights in the Great Lakes and their natural resources."). *Third*, because the submerged lands of Lake Michigan are forever imprinted with the public trust, the state has the power to revoke a conveyance that impairs public trust interests. Michigan possesses this power because "[l]ong ago" its Supreme Court adopted the "universally accepted rules" of public trusteeship

13

announced in *Illinois Central*, which affirmed the power and duty to revoke. *See Obrecht*, 105 N.W.2d at 149.

The Michigan Officials' issuance of the 2020 Notice of Revocation was entirely consistent with these principles. The lack of "due finding" at the time the 1953 Easement was granted undergirded their determination, as "sworn guardian[s]" of the State's public trust obligations, *id.* at 148, that the Easement never satisfied the public trust and was thus void from inception. *See* Notice of Revocation at 4-5. In addition, the Michigan Officials had commissioned extensive analyses of the condition and operation of the Straits Pipelines. *Id*. at 5-9. Based on an exhaustive recitation of supporting facts (including Enbridge's substantial, incurable violations of the technical engineering specifications), Michigan Officials concluded that the Straits Pipelines (i) are now vastly different than the original project specified in the Easement, (ii) lack the requisite "due finding" for a changed project, and (iii) pose a substantial and unreasonable threat to public trust resources and uses (including navigation). *Id.* at 1, 3-9, 11-17 and 20. In full accordance with public trust principles established long ago in United States and Michigan Supreme Court precedents, the Michigan Officials' issuance of the Notice of Revocation was a necessary and valid exercise of an essential attribute of state sovereignty—protection of the public trust.

## II.    Michigan and its Officials have Eleventh Amendment immunity because Enbridge's Complaint directly challenges both the State's

14

**title to and its public trust responsibility for Lake Michigan bottomlands.**

Michigan's title to the bottomlands at the Straits of Mackinac and the state's public trust doctrine rights and responsibilities with respect to those submerged lands comprise an "essential attribute" of state sovereignty. Enbridge's suit seeks to divest the state of its rights and responsibilities under the public trust doctrine. But the public trust that infuses the waters and bottomlands of the Straits of Mackinac is inextricably intertwined with the state's sovereign title to the bottomlands. *See* Section I.A, *supra*. Thus, Enbridge's federal suit against Michigan Officials directly implicates the state's core sovereignty interests relating to its title to and dominion and control of public trust bottomlands—interests that are no different than the "special sovereignty interests" protected from attack in *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261 (1997).

A.    **The *Ex parte Young* exception to sovereign immunity does not apply to State officials' discharge of public trust responsibilities that infuse State title to submerged lands.**

In *Coeur d'Alene*, the Supreme Court held that *Ex parte Young*, 209 U.S. 123 (1908), did not apply to a suit for injunctive relief brought by a Tribe against Idaho officials because the Tribe's suit implicated "special sovereignty interests" of the state that are shielded from attack in federal court by the Eleventh Amendment. 521 U.S. at 281. Both the principal opinion authored by Justice Kennedy and Justice O'Connor's concurrence (in part) make clear that the core sovereign interest at stake

in *Coeur D'Alene* was not merely legal title, but Idaho's right to control the use of the waters of and lands submerged under Lake Coeur d'Alene, as an inseparable incident of state sovereign title. Justice Kennedy noted that the relief sought by the Tribe would shift "substantially all of the benefits of ownership and control from the State to the Tribe" and that the "suit seeks, in effect a determination that the lands in question are not even within the regulatory jurisdiction of the State." State control of public trust lands would be lost and state sovereignty undermined if the Tribe prevailed:

> The requested injunctive relief would bar the State's principal officers from exercising their government powers and authority over the disputed lands and waters. The suit would diminish, even extinguish, the State's control over a vast reach of the lands and waters long deemed by the State to be an integral part of its territory. To pass this off . . . as causing little or no offense to Idaho's sovereign authority and its standing in the Union would ignore the realities of the relief the Tribe demands.

*Id*. at 282; *see id*. at 289 (O'Connor, J., concurring).

Both the majority and concurring justices in *Coeur d'Alene* were focused on *control of*, and not just title to, submerged lands, as such lands have "a unique status in the law and [are] infused with a public trust." *Id*. at 283; *id*. at 289 (O'Connor, J., concurring) ("We have repeatedly emphasized the importance of submerged lands to state sovereignty. Control of such lands is critical to a State's ability to regulate use of its navigable waters."). Because the Tribe's lawsuit so directly implicated the state's sovereign dominion and control over bottomlands held in public trust, it fell

16

outside the *Ex parte Young* exception. The Court concluded that "[t]he dignity and status of its statehood allow[ed] Idaho to rely on its Eleventh Amendment immunity," and ordered the Tribe's action dismissed. *Id.* at 287–88.[14] The decision in *Coeur d'Alene* makes clear that a lawsuit that would strip a state of its public trust rights and responsibilities over submerged lands held in public trust is "close to the equivalent" of an action to quiet title in state-owned lands, which is a state cannot be forced into federal court to defend. *Id*. at 281-82.

### B.    Enbridge's requested relief aims directly at "special sovereign interests" within the immunity shield of the Eleventh Amendment and *Coeur d'Alene*.

Enbridge's Complaint flies directly in the face of *Coeur d'Alene* because it targets the same pillar of state sovereignty that was central in that case—control of submerged lands held in trust by the state. The parallels between *Coeur d'Alene* and this case are striking. In each case the *res* in dispute was submerged lands beneath

---

[14] Idaho's title claim was later defeated in a separate lawsuit on the grounds that Congress had asserted federal sovereignty over the disputed waters and lands, as trustee for Tribe, whose territorial rights had been secured by federal actions creating the Tribe's reservation prior to Idaho's statehood. *Idaho v. United States*, 533 U.S. 262, 279-81 (2001). Since the United States was the plaintiff in that case, Eleventh Amendment sovereign immunity was not implicated. FLOW and GLBN fully support the rights of sovereign tribal nations guaranteed by treaty, especially those at issue in Line 5 litigation in both Michigan and Wisconsin. *See* Bay Mills Indian Community–Enbridge Information Portal, https://www.baymills.org/enbridge-information-portal and Bad River Band, *What to Know about the Bad River Band's Lawsuit Against Enbridge,* https://www.badriver-nsn.gov/wp-content/uploads/2024/03/Handout-about-Line-5-3-pages.pdf.

navigable waters that historically have been recognized as sovereign lands of the state. 521 U.S. at 283. As in *Coeur d'Alene*, Enbridge's Complaint seeks broad declaratory and injunctive relief that, if granted, would divest the state of its sovereign control of lands infused with "a public trust that the State itself is bound to respect," thus directly implicating a "special sovereign interest" of the state. *Id*. [15] And here, as in *Coeur d'Alene*, the Complaint "seeks, in effect, a determination that the lands in question are not even within the regulatory jurisdiction of the State." *Id.* at 282.

The District Court got it wrong in declaring that this challenge to Michigan Officials' exercise of the state's public trust rights and responsibilities does not resemble the attack on state sovereignty over the submerged lands at issue in *Coeur d'Alene*. (R. 94, PageID# 945) ("*Coeur d'Alene* is a narrow decision and this case does not involve allegations remotely close to it."). To the contrary, there is no reasonable construction of the Complaint that does not implicate an immediate and substantial impact on the state of Michigan's jurisdictional control over its public lands occupied by the Straits Pipelines. The District Court reached its decision only by isolating the state's bare title from the state's public trust duties. *See id*.

---

[15]The Complaint's prayer for relief on all counts seeks an injunction prohibiting defendants from *taking any steps* that interfere with the operation of Line 5, including but not limited to revocation or termination of the 1953 Easement. *See* Complaint at 19 (R. 1-1, PageID# 19).

("[Enbridge] asserts no title rights of any kind, whether to bottomlands in the Straits or to any other property in which Michigan claims title."). But this is a strained and unnatural separation of sovereign title from the public trust responsibilities that "infuse[]" sovereign title. *Coeur d'Alene*, 521 U.S. at 282-83. *See* Sections I.A and I.C, *supra*. Justice O'Connor also rejected this separation in her concurrence, observing that the possession and control of land, in the context of submerged lands subject to the public trust, is indistinct from state title therein. 521 U.S. at 291 (O'Connor, J., concurring) ("Whatever distinction can be drawn between possession and ownership of real property in other contexts, it is not possible to make such a distinction for submerged lands."). The injunction Enbridge seeks would disable the state from exercising a sovereign and solemn responsibility that is not separable from sovereign title, and Enbridge's case accordingly cannot survive the rule of *Coeur d'Alene.*

Even under the District Court's constrained view of the rule in *Coeur d'Alene*, it is clear that Enbridge's lawsuit is in fact the "functional equivalent" of an action to quiet title, as the State Officials demonstrate in their opening brief. Enbridge admitted as much in its briefing to this Court in *Nessel v. Enbridge Energy L.P.*, 104 F.4th 958, 963, 965 (6th Cir. 2024). There, Enbridge acknowledged that it is challenging the State's title to Lake Michigan bottomlands, claiming such title is "burdened" by the federal Submerged Lands Act, 43 U.S.C. § 1301 *et seq.* and other

19

federal laws. According to Enbridge, the State's "property was burdened from the beginning by [the Act's] reservation of rights. [citations omitted]. This burden on the State's title governs the scope of the State's ownership interest in the Straits bottomlands." Br. of Appellees, *Nessel v. Enbridge Energy L.P.*, No. 23-1671, PageID#44 (emphasis added).[16] The implication of Enbridge's argument is clear— it seeks to leverage federal law to create for itself a new property interest in submerged lands that far exceeds the rights granted by the 1953 Easement.

It is hard to image a more direct challenge to sovereign title. Enbridge's own words—"burden" on title "governs the scope of the State's *ownership interest* in the Straits bottomlands"—bespeak the essence of an action to quiet title. Enbridge is essentially asking the federal judiciary to confer on it a property interest that it does not possess under the Easement, one that is the "functional equivalent" of exclusive title; all without regard to Michigan's rights and responsibilities under its robust and historic public trust doctrine. But even if Enbridge's lawsuit is somehow deemed not to be the functional equivalent of a quiet title action, the sovereign immunity

---

[16] Enbridge artfully avoided pleading its "burden on title" theory to steer clear of the obvious "equivalence" of its Complaint to quiet title and the impact of *Coeur*, but this Court may consider how Enbridge has characterized its action in other pleadings filed in this Court. *See Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015) ("When a Rule 12(b)(1) motion attacks the factual basis for jurisdiction . . . the district court has broad discretion over what evidence to consider and may look outside the pleadings to determine whether subject-matter jurisdiction exists.").

rationale of *Coeur d'Alene* would still require dismissal because of the *effect* of the lawsuit. A lawsuit that seeks to remove state lands from the protective shield of the public trust doctrine surely implicates a sovereignty interest no less "special" to the state than the state sovereign interests at stake in *Coeur d'Alene*. Nothing in *Coeur d'Alene* suggests that the only sovereign interest special enough to be eligible for exception to *Ex parte Young* is that which can be unambiguously described as the "functional equivalent" to a suit to quiet title. To so hold would require adherence to an "an empty formalism" of the kind eschewed by the Court in *Coeur d'Alene*. *Id*. At 270. "We must examine the *effect* of the [plaintiff's] suit and its impact on these special sovereignty interests in order to decide whether the *Ex parte Young* fiction is applicable." *Id.* at 281 (emphasis added); *id*. at 291 (O'Connor, J., concurring) (observing that a ruling for plaintiff, "in *practical effect*, would be indistinguishable from an order granting the Tribe title to submerged lands, [thus] the *Young* exception to the Eleventh Amendment's bar is not properly invoked here.") (emphasis added). This Court should likewise look to the pernicious effect, and not just the form, of the Complaint's assault on the dignity of the state of Michigan in being hauled into federal court to defend its exercise of a core sovereign right and responsibility. *Cf. Barton v. Summers*, 293 F.3d 944, 951 (6th Cir. 2002) (holding that interference with the collection of state funds, though not a quiet title action, "is interference with a 'special sovereign interest' under *Coeur d'Alene*.").

## III.    CONCLUSION

Enbridge's Complaint is an affront to the state's sovereign title and right to "dominion and control" of submerged lands that are guaranteed by the equal footing and public trust doctrines. The Defendants' motion to dismiss should have been granted because the Complaint falls squarely within the rule of *Idaho v. Coeur d'Alene Tribe of Idaho*.

Respectfully submitted,

 /s/ James M. Olson
James M. Olson (P18485)
*Counsel of Record for*
*FOR LOVE OF WATER*
440 West Front Street
Suite 100
Traverse City, MI 49684
(231) 944-1568
olson@envlaw.com

 /s/ Andy Buchsbaum
Andy Buchsbaum (P39620)
*Counsel of Record for*
Great Lakes Business Network
Buchsbaum & Associates LLC
1715 David Court
Ann Arbor, MI 48105
(734) 717-3665
buchsbauma@gmail.com

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1. This Brief complies with the word count limit of FRAP 29(5). This brief was written using Microsoft Word version Office 365 and has a word count of 6,469 words.

2. This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) and was prepared using 14-point Times New Roman a proportionally spaced font.

Respectfully submitted,


 /s/ James M. Olson
James M. Olson (P18485)
*Counsel of Record for*
*FOR LOVE OF WATER*
440 West Front Street
Suite 100
Traverse City, MI 49684
(231) 944-1568
olson@envlaw.com

## CERTIFICATE OF SERVICE

I certify that on October 22, 2024, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

Respectfully submitted,

 /s/ James M. Olson
James M. Olson (P18485)
*Counsel of Record for*
*FOR LOVE OF WATER*
440 West Front Street
Suite 100
Traverse City, MI 49684
(231) 944-1568
olson@envlaw.com

24