No. 24-1608

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

---

Enbridge Energy, Limited Partnership; Enbridge Energy Company, Inc.; Enbridge Energy Partners, L.P.,

Plaintiffs-Appellees,

v.

Gretchen Whitmer, *the Governor of the State of Michigan in her official capacity*; Daniel Eichinger, *Director of the Michigan Department of Natural Resources in his official capacity*,

Defendants-Appellants.

---

Appeal from the United States District Court
for the Western District of Michigan
Case No. 1:20-cv-1141

---

# BRIEF OF AMICI CURIAE
# NORTH AMERICA'S BUILDING TRADES UNIONS AND
# UNITED STEELWORKERS, AFL-CIO-CLC
# IN SUPPORT OF PLAINTIFFS-APPELLEES

---

David R. Jury, General Counsel
UNITED STEELWORKERS
60 Boulevard of the Allies
Room 807
Pittsburgh, PA 15222
(412) 562-2545

*Counsel for United Steelworkers*

Jonathan D. Newman
Jacob J. Demree
SHERMAN DUNN, P.C.
900 Seventh St., N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300

*Counsel for North America's Building Trades Unions*

November 22, 2024

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 24-1608 _____    Case Name: Enbridge Energy, L.P. v. Whitmer _____

Name of counsel:  Jacob J. Demree _____

Pursuant to 6th Cir. R. 26.1, North America's Building Trades Unions _____
*Name of Party*

makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
      identity of the parent corporation or affiliate and the relationship between it and the named
      party:

> No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
      in the outcome?  If yes, list the identity of such corporation and the nature of the financial
      interest:

> No.

---

CERTIFICATE OF SERVICE

I certify that on _____ November 22, 2024 _____ the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not,
by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/Jacob J. Demree _____

900 Seventh Street, N.W., Suite 1000 _____

Washington, D.C. 20001 _____

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# 6th Cir. R. 26.1
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a) **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b) **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c) **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 24-1608      Case Name: Enbridge Energy, L.P. v. Whitmer

Name of counsel: David R. Jury

Pursuant to 6th Cir. R. 26.1, United Steelworkers

*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

---

## CERTIFICATE OF SERVICE

I certify that on _____ November 22, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/David R. Jury
60 Boulevard of the Allies, Room 807
Pittsburgh, PA 15222

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# 6th Cir. R. 26.1
## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

(a) **Parties Required to Make Disclosure**.  With the exception of the United States government or agencies thereof or a state government or agencies or political subdivisions thereof, all parties and amici curiae to a civil or bankruptcy case, agency review proceeding, or original proceedings, and all corporate defendants in a criminal case shall file a corporate affiliate/financial interest disclosure statement.  A negative report is required except in the case of individual criminal defendants.

(b) **Financial Interest to Be Disclosed**.

(1)  Whenever a corporation that is a party to an appeal, or which appears as amicus curiae, is a subsidiary or affiliate of any publicly owned corporation not named in the appeal, counsel for the corporation that is a party or amicus shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the parent corporation or affiliate and the relationship between it and the corporation that is a party or amicus to the appeal.  A corporation shall be considered an affiliate of a publicly owned corporation for purposes of this rule if it controls, is controlled by, or is under common control with a publicly owned corporation.

(2)  Whenever, by reason of insurance, a franchise agreement, or indemnity agreement, a publicly owned corporation or its affiliate, not a party to the appeal, nor an amicus, has a substantial financial interest in the outcome of litigation, counsel for the party or amicus whose interest is aligned with that of the publicly owned corporation or its affiliate shall advise the clerk in the manner provided by subdivision (c) of this rule of the identity of the publicly owned corporation and the nature of its or its affiliate's substantial financial interest in the outcome of the litigation.

(c) **Form and Time of Disclosure**.  The disclosure statement shall be made on a form provided by the clerk and filed with the brief of a party or amicus or upon filing a motion, response, petition, or answer in this Court, whichever first occurs.

# TABLE OF CONTENTS

Corporate Disclosure Statements ................................................................

Table of Authorities............................................................................ii

Introduction and Statement of Interest.....................................................1

Argument....................................................................................5

    I.    Line 5 Provides Thousands of Good, Middle-Class Jobs that Support the Energy Needs of the Upper Midwest and Canada. ..........................................................5

    II.    This Is a Straightforward *Ex parte Young* Case. ................13

        A.    Enbridge Seeks Prospective Relief for an Ongoing Violation of Its Constitutional Rights. ........................13

        B.    Enbridge's Suit Is Not Functionally Equivalent to an Action to Quiet Title. .............................................17

        C.    Michigan's Sovereign Interests Do Not Protect It from Suit Here..............................................24

Conclusion ...........................................................................30

Certificate of Compliance............................................................

Certificate of Service .................................................................

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Agua Caliente Band of Cahuilla Indians v. Hardin*,
   223 F.3d 1041 (9th Cir. 2000) ...................................... 25

*ANR Pipeline Co. v. LaFaver*,
   150 F.3d 1178 (10th Cir. 1998) ..................................... 27

*Arnett v. Myers*,
   281 F.3d 552 (6th Cir. 2002) ............................ 18-19, 22, 25-26, 28

*Chisholm v. Georgia*,
   2 U.S. (2 Dall.) 419 (1793) ............................................ 14

*Dubuc v. Mich. Bd. of L. Examiners*,
   342 F.3d 610 (6th Cir. 2003) ................................... 25, 28

*Duke Energy Trading & Marketing, LLC v. Davis*,
   267 F.3d 1042 (9th Cir. 2001) ..................................... 28-29

*Ex parte Young*,
   209 U.S. 123 (1908) ....................................... 1, 13-16, 18, 24-26, 28

*Franke v. Boyle*,
   No. 23-cv-85, 2024 U.S. Dist. LEXIS 10453 (D. Alaska Jan. 22, 2024) ................................................................. 20-21

*Green v. Mansour*,
   474 U.S. 64 (1985) ...................................................... 16

*Hamilton v. Myers*,
   281 F.3d 520 (6th Cir. 2002) ................................... 18-19, 22, 25-26

*Hill v. Kemp*,
   478 F.3d 1236 (10th Cir. 2007) ................................. 25, 27

*Hood Canal Sand & Gravel, LLC v. Brady,*
No. 14-cv-5662, 2014 U.S. Dist. LEXIS 150048 (W.D. Wash.
Oct. 22, 2014) ................................................................. 21

*Idaho v. Coeur d'Alene Tribe of Idaho,*
521 U.S. 261 (1997) ................................. 15, 17-21, 23-29

*Ind. Prot. & Advoc. Servs. v. Ind. Family & Soc. Servs. Admin.,*
603 F.3d 365 (7th Cir. 2010) (en banc) ......................... 25

*Lacano Invs., LLC v. Balash,*
765 F.3d 1068 (9th Cir. 2014) ....................................... 21

*MacDonald v. Vill. of Northport,*
164 F.3d 964 (6th Cir. 1999) ..................................... 26-27

*Mich. Dep't of Nat. Res. v. Carmody-Lahti Real Est., Inc.,*
699 N.W.2d 272 (Mich. 2005) ....................................... 20

*Pavlock v. Holcomb,*
532 F. Supp. 3d 685 (N.D. Ind. 2021), *aff'd*, 35 F.4th 581 (7th
Cir. 2022) .................................................................... 22

*RLR Invs., LLC v. City of Pigeon Forge,*
4 F.4th 380 (6th Cir. 2021) ........................................... 27

*Severance v. Patterson,*
566 F.3d 490 (5th Cir. 2009) .............................. 20-21, 28

*Silva v. Farrish,*
47 F.4th 78 (2d Cir. 2022) ........................................... 19

*United States v. Moody,*
206 F.3d 609 (6th Cir. 2000) ......................................... 27

*Va. Off. for Prot. & Advoc. v. Stewart,*
563 U.S. 247 (2011) ............................................... 16, 18

*Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.,*
535 U.S. 635 (2002) ............................... 15, 24-25, 27

*W. Mogehan Tribe & Nation v. Orange Cnty.*,
　　395 F.3d 18 (2d Cir. 2004) (per curiam)...................................21-22

*Ysleta del Sur Pueblo v. Laney*,
　　199 F.3d 281 (5th Cir. 2000) ........................................................ 22

**Other Authorities**

ACT Ohio, *Lucas County Prevailing Wage Rates*,
　　https://www.actohio.org/issues/prevailing-wage/by-county/
　　lucas-county/ (last visited Nov. 21, 2024) ........................................ 9

Fed. R. App. P. 29(a)(2) ...................................................................... 4

Fed. R. App. P. 29(a)(4)(E) .................................................................. 4

Mich. Const. art. XI, § 1 ...................................................................... 16

*Ownership*, *Black's Law Dictionary* (11th ed. 2019) .............................. 18

Restatement (Third) of Property: Servitudes § 1.2 (Am. L. Inst.
　　2000) ...............................................................................................19-20

*The Federalist No. 28* (Alexander Hamilton) (Clinton Rossiter ed.,
　　1961) ..............................................................................................13-14

*The Federalist No. 80* (Alexander Hamilton) (Clinton Rossiter ed.,
　　1961) ................................................................................................. 14

*The Federalist No. 81* (Alexander Hamilton) (Clinton Rossiter ed.,
　　1961) ................................................................................................. 14

U.S. Const. amend. XI...................................................................... 1, 27

U.S. Const. art. I, § 8, cl. 3 ................................................................... 1

U.S. Const. art. VI, cl. 2 ...................................................................13-16

# INTRODUCTION AND STATEMENT OF INTEREST

On November 13, 2020, Defendants-Appellants Governor Gretchen Whitmer and Department of Natural Resources Director Daniel Eichinger signed a Notice of Revocation and Termination of Easement, stating that they were revoking and terminating a 1953 Easement that authorizes the Plaintiffs-Appellees (together, "Enbridge") to operate dual pipelines in the Straits of Mackinac ("Straits Pipeline"). The Notice required Enbridge to shutter the Straits Pipeline within 180 days. Notice of Revocation, R. 1-1, Page ID # 41. Enbridge brought suit seeking declaratory and injunctive relief asserting that the Defendants-Appellants' actions were preempted by federal law and violated the Commerce Clause and Foreign Commerce Clause of the U.S. Constitution, as well as the Foreign Affairs Doctrine. This appeal concerns whether the Eleventh Amendment bars Enbridge's claims.

Thousands of jobs, and millions in middle-class wages and benefits, are on the line, and Enbridge has alleged that moving forward with the Michigan officials' plan would violate its constitutional rights. But those state officials pervert the straightforward *Ex parte Young*, 209 U.S. 123 (1908) test to argue that they are immune from suit. This Court should

affirm the district court's well-reasoned rejection of the state officials' arguments so a federal court can review the constitutionality of the officials' actions.

Workers represented by North America's Building Trades Unions ("NABTU") keep the Line 5 pipeline and associated facilities running, delivering energy sources throughout the Upper Midwest and Canada. NABTU is a labor organization composed of fourteen national and international unions and over 330 provincial, state, and local building and construction trades councils representing more than three million workers in the construction industry. Thousands of those workers are employed in the pipeline and energy sector, including:

- Pipefitters and welders represented by the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada;

- Heavy equipment operators, mechanics, and surveyors represented by the International Union of Operating Engineers, who operate, maintain, and repair the equipment used on pipeline projects;

- Transportation workers represented by the International

Brotherhood of Teamsters, who move material and people to, from, and around the sites where pipelines are built, repaired, and maintained;

- Construction laborers represented by the Laborers International Union of North America, who clear rights of way, prepare jobsites, place pipes, and restore the landscape after the pipeline is buried; and

- Electricians represented by the International Brotherhood of Electrical Workers, who work at pumping and service stations along pipelines to ensure that the instruments, valves, gauges, pumps, and motors operate properly.

Members of all of NABTU's affiliates also perform critical maintenance and repair of facilities that rely on pipelines like Line 5, including refineries that refine crude oil and fractionators that separate propane and butane from natural gas liquids.

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC ("United Steelworkers" or "USW") represents approximately 600,000 members in the United States and Canada in

numerous industrial and other sectors, including the energy sector, where it represents employees working in oil refineries, as well as those involved in maintaining and constructing pipelines. USW is the largest union in the American refining industry, representing production and maintenance workers at over seventy refining locations in the United States — facilities that together contribute over two-thirds of the nation's domestic fuels. USW represents workers in refineries that are fed by Line 5 and whose employment would be jeopardized if Line 5 were closed.

NABTU and USW have a strong interest in this case, which could determine the future employment and wellbeing of thousands of their members. They file this brief under Federal Rule of Appellate Procedure 29(a)(2). All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), NABTU, USW, and their counsel declare that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money to fund the preparation or submission of the brief; and (3) no person other than NABTU and USW, their members, and their counsel has contributed money to fund the preparation or submission of the brief.

# ARGUMENT

## I.   Line 5 Provides Thousands of Good, Middle-Class Jobs that Support the Energy Needs of the Upper Midwest and Canada.

Line 5 has transported energy sources through Wisconsin and Michigan and Ontario, Canada, for over six decades.   Refineries in Michigan, Ohio, Pennsylvania, Ontario, and Quebec depend on the crude oil Line 5 delivers, and facilities in Wisconsin, Michigan, and Ontario rely on Line 5 to provide natural gas liquids ("NGLs") to produce propane and butane essential to meeting consumer heating demands in those and other jurisdictions.   Thousands of NABTU and USW members in the United States and Canada operate and maintain the pipeline and its associated industrial facilities, earning solid, middle-class wages and benefits.

For members of the building and construction trades, the work associated with Line 5 falls into two basic categories: (1) maintaining the current pipeline, and (2) servicing the heavy industry Line 5 supports. Along Line 5's route, Enbridge operates pump stations and other facilities that NABTU members routinely service.   Workers ensure that pressure gauges and pumps are operating properly, and they repair and

replace equipment as needed. These workers also monitor Line 5 itself — inspecting the pipeline and its structural components (including its supports) for problems like corrosion, dents, and cracks, and making necessary repairs, which can include anything from reinforcing a portion of pipe to full-scale replacement of a pipe segment. Line 5 further supports thousands of jobs in facilities that process and use crude oil and NGLs, including refineries and fractionators.

Line 5 begins at its main terminal in Superior, Wisconsin, where USW represents approximately 140 Enbridge production and maintenance employees. Traversing Michigan, Line 5 is the exclusive source of NGLs to a fractionator in Rapid River, Michigan, which is the primary source of propane for the Upper Peninsula. The pipeline also provides nearly 30% of the crude processed by Marathon Oil's Detroit facility.

Crude oil transported by Line 5 reaches two Ohio refineries, as well: PBF Energy Toledo and the Cenovus Refinery. USW represents approximately 375 production and maintenance and office and technical employees at PBF Energy's Toledo Refinery, and 325 process, production, and maintenance employees at the Cenovus Refinery (formerly known as

the bp-Husky Toledo Refinery).

In Canada, Line 5 is the major source of product to Sarnia, Ontario's vast industrial base. Line 5 is the only existing, feasible transportation mode to provide NGLs to Plains Midland Canada's Sarnia fractionator, which produces butane and propane. Line 5 crude oil also reaches Imperial Oil's Sarnia operations (a complex consisting of a refinery, chemical plant, and petroleum research facility), the Suncor Sarnia refinery, and the Shell Sarnia refinery. Line 5 feeds pipelines that support the Imperial Nanticoke refinery in Ontario, the Suncor Montreal and Valero Levis refineries in Quebec, and United Refining's facility in Warren, Pennsylvania.

These are all large facilities, covering acres of land and housing a web of complex, heavy machinery that must operate consistently and, except in the case of required maintenance, without interruption to provide the energy and fuel needed to meet consumer demand. The skilled building trades workers represented by NABTU's affiliates constantly monitor, maintain, and repair this equipment in facilities across the Upper Midwest and in Canada. Thousands of these workers are employed on an ongoing basis in these facilities, while thousands of

others are brought in on an as-needed or regularly scheduled basis when the plants are completely shut down for full-scale equipment overhauls.

If Line 5 ceased operation, the refineries in Michigan, Ohio, Ontario, Quebec, and Pennsylvania that depend on the products the pipeline carries would either have to significantly reduce production or close down completely. In either case, the impact on workers who depend on Line 5 for their employment would be dramatic.

Take just the two Ohio refineries. Data collected by NABTU's affiliated unions shows that in 2020 — during the COVID-19 pandemic — their members performed 2,000,614 hours of routine and large-scale maintenance at the PBF Energy and Cenovus refineries in Toledo, Ohio. That's approximately equivalent to full-time employment for *one thousand workers*, which is in addition to the production and other maintenance work performed by USW members employed directly at these facilities.[1]

---

[1] Because many construction trades workers often work intermittently, moving from job to job and employer to employer, and

Wage rates vary by trade and by experience level, but for perspective, the average hourly wage for building trades workers in Lucas County (the site of the refineries) is approximately $41.03. *See* ACT Ohio, *Lucas County Prevailing Wage Rates* (averaging wages for the second-highest and second-lowest total prevailing rates, which are often pegged to the unions' negotiated rates).[2] At that rate, losing 2,000,614 hours of work would translate into a loss of $82.08 million in wages at the Ohio refineries alone.

Shutting down Line 5 would have a similarly devastating effect on the refinery workers USW represents. It is highly unlikely they would be able to find jobs with similar wage, benefit, and retirement savings

---

because wages and benefits are paid and reported on an hourly basis, employment in the industry is commonly tracked through hours of work rather than numbers of individual workers. Assuming the reported hours reflect full-time employment (forty hours a week for fifty weeks in a year), these numbers would represent work for 1,000 individuals. However, while the employees performing routine maintenance are likely employed on an on-going basis in these refineries, many more are brought in for large-scale, albeit short-term, projects, meaning the lives of far more than 1,000 individual workers would be affected by shuttering these plants.

[2]  https://www.actohio.org/issues/prevailing-wage/by-county/lucas-county/ (last visited Nov. 21, 2024).

structures elsewhere in their regional economy following a disruption in supply to the Toledo refineries. The threats of disruption are tangible, and the potential for a replacement means of transporting the crude oil to the refineries is, at best, highly speculative.

The light crude oil Line 5 supplies to PBF Energy's Toledo Refinery is primarily refined into jet fuel that supplies the bulk of the fuel for the Detroit Metro Airport. PBF Energy's Toledo Refinery processes approximately 189,000 barrels per day, or the equivalent of 900 to 1,000 tanker truck loads. There are currently no viable alternative sources of crude oil for this facility, as its location lacks the infrastructure to receive the needed supply by rail or truck. For that reason, it is almost certain that if Line 5 were shut down, the production and maintenance employees at this facility would lose their jobs. Those are good-paying, family-sustaining jobs (with straight-time hourly wage rates ranging from $41.20 to $51.55 for senior production and maintenance employees) that allow USW members to contribute to the economic vitality of Toledo and its surrounding communities.

The Cenovus Toledo Refinery likewise receives crude oil transported on Line 5. Should Line 5 be shut down, Cenovus would need

to locate an alternative source for crude oil, and even if the facility did not close altogether, its operations would be disrupted, and with it, the financial stability of USW's members, whose straight time hourly rates for senior employees range from $44.76 to $55.55 per hour.

For NABTU's affiliates' members, job loss means more than lost income.  In the construction industry, unions often negotiate collective bargaining agreements with multiemployer contracting groups to ensure that as the workers move from job to job and contractor to contractor, they work under similar conditions and accrue benefits that travel with them.  These agreements require employers to pay hourly wages commensurate with the employees' skills *and* to contribute to jointly-trusteed employee benefit funds that pool the contributions for the benefit of all workers employed under the multiemployer contract.  These funds provide employees with health insurance and pension benefits and finance the building trades' robust training programs.

Entitlement to these vital benefits and the amount an employer is required to pay out depend on the availability of work and the number of hours worked.  For example, workers often must work some minimum number of hours during a specified period to be eligible for health

insurance. Retirement benefits are also computed based on hours worked, so any break in employment reduces the resources a worker can expect to rely on in retirement. Moreover, the overall viability of the benefit funds covering these workers depends on the amount of work available in the area over time.

Returning to the Toledo refineries, at an average hourly benefit contribution of $23.46 (based on averaging the prevailing fringe benefit contributions for the second-highest and second-lowest total rates), the potential closure of the two refineries could place annual benefit contributions of $46.92 million in jeopardy. That amounts to a total of approximately *$129 million* in potentially lost wages and benefits at just the Ohio refineries. Many of NABTU's affiliates' members would struggle to find comparable work in the same geographic area, straining these workers and their families, as well as the area's overall social safety net.

This level of dislocation would threaten the construction industry's ability to train for the future. The trades and their signatory contractors fund and operate a vast network of apprenticeship and other training programs. Because the programs are financed by contributions based on

hours worked under the parties' collective bargaining agreements, their financial viability depends on the availability of work. But so too does the training, the heart of which is the ability to merge classroom and on-the-job instruction. Without jobs to staff, the vital on-the-job training element disappears, threatening the building trades' ability to bring new workers into industries that could provide them with solid and sustainable well-paying careers.

The situation is the same in all the facilities that depend on Line 5. Sudden closures of the pipeline threaten catastrophic losses of good-paying, middle-class jobs that provide skilled workers in the United States and Canada with consistent employment, health insurance, pensions, and other benefits, and opportunities for the next generation of working people to achieve the same.

## II. This Is a Straightforward *Ex parte Young* Case.

### A. *Enbridge Seeks Prospective Relief for an Ongoing Violation of Its Constitutional Rights.*

The Constitution and laws of the United States are "the supreme Law of the Land," to which all state officials are bound. U.S. Const. art. VI, cl. 2. Federal courts are empowered to "check the usurpations of the state governments" to ensure compliance with federal law. *The*

*Federalist No. 28*, at 181 (Alexander Hamilton) (Clinton Rossiter ed., 1961).  Otherwise, the Supremacy Clause would be toothless:  "No man of sense will believe that [constitutional] prohibitions would be scrupulously regarded without some effectual power in the government to restrain or correct the infractions of them."  *The Federalist No. 80*, *supra*, at 475-76 (Alexander Hamilton).

At the same time, it is undoubtedly "inherent in the nature of [state] sovereignty not to be amenable to the suit of an individual *without its consent*."  *The Federalist No. 81*, *supra*, at 487 (Alexander Hamilton); *see also Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 449 (1793) (Iredell, J., dissenting).  By extension, *state officials* are protected from suit when they exercise discretion in the name of the state.  *Ex parte Young*, 209 U.S. 123, 158 (1908).

*Ex parte Young* resolves the state sovereignty-federal supremacy conflict:  Where "[t]he act to be enforced is alleged to be unconstitutional, . . . the use of the name of the State to enforce [it] . . . is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity."  209 U.S. at 159.  A state official's enforcement of the unconstitutional law "*is simply an illegal act*," which

federal courts have the power (and, under the Supremacy Clause, the duty) to enjoin. *Id.* (emphasis added). The Court explained that "individuals, who, as officers of the State, are clothed with some duty in regard to the enforcement of the laws of the State, . . . may be enjoined by a Federal court" from enforcing an unconstitutional law. *Id.* at 155-56. There is no sovereign immunity issue because "[a]n injunction to prevent [a state official] from doing that which he has no legal right to do is not an interference with the discretion of an officer." *Id.* at 159.

Under *Ex parte Young*, courts face a simple, "straightforward inquiry" when a plaintiff seeks relief against state officers in their official capacity: whether the complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in the judgment)). That inquiry "does not include an analysis of the merits of the claim." *Id.* at 646.

Therefore, *Ex parte Young* "cannot be used to obtain an injunction requiring the payment of funds from the State's treasury, . . . or an order for specific performance of a State's contract" — those remedies (and any

form of retrospective relief) would require the state to take an affirmative action, which would infringe its sovereign immunity. *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256-57 (2011). But prospective relief "gives life to the Supremacy Clause" by "assuring the supremacy of [federal] law." *Green v. Mansour*, 474 U.S. 64, 68 (1985). Federal courts must be able to decide claims based on federal rights where the relief requested would not compel *the state* to affirmatively do anything.

Here, Governor Whitmer and Director Eichinger act within their authority only to the extent they enforce *constitutional* laws and policies. *Ex parte Young*, 209 U.S. at 159; *see* Mich. Const. art. XI, § 1. They are poised to take away Enbridge's right to operate the Straits Pipeline (allegedly in violation of federal law), which will in turn cause colossal job losses for members of NABTU's affiliates and the USW. Under *Ex parte Young*, the district court has authority to decide whether the Michigan officials' enforcement of the Notice of Revocation and Termination of Easement complies with the Constitution and to issue prospective relief to avoid the ongoing violation of Enbridge's federal rights.

### B. Enbridge's Suit Is Not Functionally Equivalent to an Action to Quiet Title.

Governor Whitmer and Director Eichinger argue that Enbridge is really pursuing the equivalent of a quiet title action, which, under *Coeur d'Alene*, would violate Michigan's sovereign immunity. Opening Br. 27-36. *Coeur d'Alene* involved competing claims to ownership of submerged lands by the State of Idaho and the Coeur d'Alene Tribe. The limited reason for granting certiorari was "to consider whether the suit for declaratory and injunctive relief based on the Tribe's purported beneficial interest in title may proceed." 521 U.S. at 266. The Tribe "alleged an on-going violation of *its property rights* in contravention of federal law and [sought] prospective injunctive relief." *Id.* at 281 (emphasis added). Granting the requested relief would have shifted "substantially all benefits of ownership and control" over the land to the Tribe, making the action "the functional equivalent of quiet title." *Id.* at 282. Moreover, "if the Tribe were to prevail, Idaho's sovereign interest in its lands and waters would [have been] affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury." *Id.* at 287. Sovereign immunity barred the suit.

*Coeur d'Alene* is merely "an application" of the basic principle that

*Ex parte Young* cannot be used to seek relief against the state. *Stewart*, 563 U.S. at 257. As Justice O'Connor explained in her "controlling" concurrence (*see Coeur d'Alene*, 521 U.S. at 298 (Souter, J., dissenting)), *Coeur d'Alene* was not a typical *Ex parte Young* suit. First, the Tribe was asking a federal court "to divest the State of a property interest." *Id.* at 289 (O'Connor, J., concurring in part and concurring in the judgment). Second, the Tribe sought "*to eliminate altogether* the State's regulatory power over the submerged lands at issue — to establish not only that the State has no right to possess the property, but also that the property is not within Idaho's sovereign jurisdiction at all." *Id.* (emphasis added). Unlike prospective remedies, the requested relief would require the state to completely *give up* its interests in the submerged lands, just as if the state were required to give up treasury funds (i.e., pay damages).

Here, all that is at issue is Enbridge's continued *use* of state lands pursuant to an easement. To be sure, the right to use property is part of the bundle of sticks comprising property ownership. *See Ownership, Black's Law Dictionary* (11th ed. 2019). But allowing a private party to *use* state property is far from divesting *title* to that property. For example, in *Arnett v. Myers*, 281 F.3d 552 (6th Cir. 2002) and *Hamilton*

*v. Myers*, 281 F.3d 520 (6th Cir. 2002), this Court considered challenges to Tennessee's removal of duck blinds from Reelfoot Lake (which is owned by the state). The owners of the removed duck blinds sought, in part, an injunction protecting their rights to use the lake. If the owners prevailed, "Reelfoot Lake [would] remain within the sovereign control of the State of Tennessee, and [would] continue to be subject to Tennessee's regulatory authority." *Arnett*, 281 F.3d at 568. Tennessee would "[a]t most" be required to recognize the owners' right to use the lake. *Id.* Therefore, the relief requested in *Arnett* and *Hamilton* was not even close to the "far-reaching and invasive relief" requested in *Coeur d'Alene*, which would have divested the state of title to its property. *Id.*; *see also Hamilton*, 281 F.3d at 528 (same); *Silva v. Farrish*, 47 F.4th 78, 85 (2d Cir. 2022) (similar).

Governor Whitmer and Director Eichinger make much of the fact that Enbridge has an *easement* on state submerged lands. "[W]hile Enbridge may not be seeking fee simple ownership of the State's bottomlands," they argue, "it *is* claiming a property interest in them." Opening Br. 30. Their argument is overly formalist. All an easement does is "create[] a nonpossessory right *to enter and use land* in the

possession of another," requiring "the possessor not to interfere with the uses authorized by the easement." Restatement (Third) of Property: Servitudes § 1.2(1) (Am. L. Inst. 2000) (emphasis added). The possessor/transferor does not lose the right to own, possess, or use the property. *See Mich. Dep't of Nat. Res. v. Carmody-Lahti Real Est., Inc.*, 699 N.W.2d 272, 284 & n.39 (Mich. 2005). "For example, the transferor of an easement for an underground pipeline retains the right to enter and make any use of the area covered by the easement that is not specifically prohibited by the easement and that does not unreasonably interfere with use of the easement for pipeline purposes." Restatement (Third) of Property: Servitudes § 1.2 cmt. d (Am. L. Inst. 2000).

*Coeur d'Alene* does not categorically prohibit federal courts from deciding controversies about easements. For example, in *Severance v. Patterson*, 566 F.3d 490 (5th Cir. 2009), the plaintiff sued to stop the state from enforcing its easement. The title to the properties at issue rested with the plaintiff, and not the state, so enjoining enforcement of the easement would not impact the state's ownership interests. *Id.* at 495.

Governor Whitmer and Director Eichinger cite *Franke v. Boyle*, No. 23-cv-85, 2024 U.S. Dist. LEXIS 10453, at *14 (D. Alaska Jan. 22, 2024)

and *Hood Canal Sand & Gravel, LLC v. Brady*, No. 14-cv-5662, 2014 U.S. Dist. LEXIS 150048, at *10 (W.D. Wash. Oct. 22, 2014), which both held that *Coeur d'Alene* **did** prohibit certain challenges to states' authority to grant easements. But the relief sought in *Franke* and *Hood Canal* reached way farther than in *Severance* or this case. *Franke* involved "not just the legal validity of the State's claimed easements over [the plaintiffs'] two properties but also the legal validity of all similarly-created section line easements *throughout the state*." 2024 U.S. Dist. LEXIS 10453, at *13 (emphasis added). And *Hood Canal* involved an easement granted to a third party over *state* lands *adjacent to* the plaintiff's property — not, as in *Severance*, an easement over the plaintiff's own property. Even if *Franke* and *Hood Canal* did apply, they, like *Severance*, are nonbinding out-of-circuit decisions. To the extent they are persuasive, they show together with *Severance* that the facts and circumstances of the case matter more than formalist generalizations.

Additional cases cited by Governor Whitmer and Director Eichinger are not to the contrary. In *Lacano Investments, LLC v. Balash*, 765 F.3d 1068, 1073 (9th Cir. 2014); *Western Mogehan Tribe & Nation v. Orange*

*County*, 395 F.3d 18, 23 (2d Cir. 2004) (per curiam); *Ysleta del Sur Pueblo v. Laney*, 199 F.3d 281, 290 (5th Cir. 2000); and *Pavlock v. Holcomb*, 532 F. Supp. 3d 685, 696-97 (N.D. Ind. 2021), *aff'd on other grounds*, 35 F.4th 581 (7th Cir. 2022), the plaintiffs claimed that they had the equivalent to fee simple title, meaning the state *would* lose its ownership rights. Here, Enbridge does not challenge Michigan's title to the submerged lands or Michigan's right to use those lands.

Instead, it seeks prospective relief to stop Michigan officials from "taking any steps to impede or prevent the interstate and international operation of Line 5, including the revocation or termination of the 1953 Easement." Complaint, R. 1, Page ID # 19. By the terms of that easement, Enbridge is seeking the right only to "construct, lay, maintain, use and operate two (2) pipe lines . . . over, through, under and upon the portion of the bottom lands of the Straits of Mackinac in the State of Michigan, together with the right to enter upon said bottom lands." 1953 Easement, R. 1-1, Page ID # 44. Nothing about that prospective relief will limit Michigan's right to own, possess, or use its submerged lands — like in *Arnett* and *Hamilton*, all that Enbridge is asking for is the nonexclusive right to use a portion of state property.

Governor Whitmer and Director Eichinger cite Justice O'Connor's statement that "[w]hatever distinction can be drawn between possession and ownership of real property in other contexts, it is not possible to make such a distinction for submerged lands." Opening Br. 26 (quoting *Coeur d'Alene*, 521 U.S. at 291 (O'Connor, J., concurring in part and concurring in the judgment)). But they ignore Justice O'Connor's observation — just two sentences later — that "a ruling in the Tribe's favor, *in practical effect*, would be indistinguishable from an order granting the Tribe title to submerged lands." 521 U.S. at 291 (O'Connor, J., concurring in part and concurring in the judgment) (emphasis added). The easement here *can* be practically distinguished from a grant of title. If Enbridge had title to the submerged lands, it could exclude state officials. Not so with respect to the easement: "Grantor [the State of Michigan] shall have the right at all reasonable times and places to inspect the pipe lines, appurtenances and fixtures authorized by this easement." 1953 Easement, R. 1-1, Page ID # 54. Therefore, granting the requested relief would not be functionally equivalent to deciding a quiet title action.

### C. Michigan's Sovereign Interests Do Not Protect It from Suit Here.

Governor Whitmer and Director Eichinger (and their amici) argue that granting Enbridge prospective relief would interfere with Michigan's sovereign interests in submerged bottomlands. Opening Br. 36-43. But absent a request for relief that would require the state to do or give up anything, Michigan's sovereign interests do not support an exception to *Ex parte Young*. This Court "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon*, 535 U.S. at 645 (quoting *Coeur d'Alene*, 521 U.S. at 296 (O'Connor, J., concurring in part and concurring in the judgment)) (alteration in original).

That's the extent of the narrow *Coeur d'Alene* doctrine. As explained above, the principal opinion in *Coeur d'Alene* held that the relief requested was *not* prospective: Requiring the state to divest its title to submerged bottomlands would be "fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury." 521 U.S. at 287. Though the principal opinion in *Coeur d'Alene* "examine[d]" the impact of the lawsuit on "special sovereignty interests," *id.* at 281, seven justices

agreed that courts should not balance states' interests to determine whether *Ex parte Young* applies, *see id.* at 296 (O'Connor, J., concurring in part and concurring in the judgment, with JJ. Scalia and Thomas); 297 (Souter, J., dissenting, with JJ. Stevens, Ginsburg, and Breyer). Justice Kennedy, the author of the principal opinion in *Coeur d'Alene*, again proposed a balancing test in *Verizon*, but no other justice joined him. *See Verizon*, 535 U.S. at 649 (Kennedy, J., concurring). After *Verizon*, the only test for determining whether *Ex parte Young* applies is the "straightforward inquiry" described by Justice O'Connor in *Coeur d'Alene*.[3]

Even before *Verizon*, this Court was clear in *Arnett* and *Hamilton* that *Coeur d'Alene* does not require courts to balance the importance of states' sovereign interests. The district court in *Hamilton* had granted

---

[3]       *Accord Ind. Prot. & Advoc. Servs. v. Ind. Family & Soc. Servs. Admin.*, 603 F.3d 365, 372 (7th Cir. 2010) (en banc); *Hill v. Kemp*, 478 F.3d 1236, 1259 (10th Cir. 2007) (Gorsuch, J.); *Dubuc v. Mich. Bd. of L. Examiners*, 342 F.3d 610, 617 (6th Cir. 2003); *see also Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1048 (9th Cir. 2000) (explaining, before *Verizon*, that "the question posed by *Coeur d'Alene* is not whether a suit implicates a core area of sovereignty, but rather whether the relief requested would be so much of a *divestiture* of the state's sovereignty as to render the suit as one *against the state itself*").

summary judgment to the state officials, holding that "the importance of state regulatory control over, and public ownership of, Reelfoot Lake militated against the [plaintiffs'] claims because the relief they requested intruded too far onto the sovereignty of the State of Tennessee." 281 F.3d at 526. But the Sixth Circuit recognized that a majority of the *Coeur d'Alene* Court "rejected Justice Kennedy's balancing approach, and held that it would continue to apply the *Ex parte Young* rule as it had been traditionally understood." *Id.* at 528-29. Governor Whitmer and Director Eichinger are wrong to argue that *Arnett* and *Hamilton* are distinguishable because the decisions depended on the "unusual circumstances" of the state's sovereign interest in those cases. Opening Br. 39. Instead, consistent with the *Ex parte Young* "straightforward inquiry," *Arnett* and *Hamilton* held that the plaintiffs alleged an ongoing violation of federal law and sought relief that would not divest the state's title to state property. *Arnett*, 281 F.3d at 568; *Hamilton*, 281 F.3d at 528.

Governor Whitmer and Director Eichinger also cite to *MacDonald v. Village of Northport*, 164 F.3d 964 (6th Cir. 1999) to argue that *Coeur d'Alene* bars Enbridge's claims. Opening Br. 38. *MacDonald* held that

"*Coeur d'Alene* requires federal courts to examine whether the relief being sought against a state official 'implicates special sovereignty interests,' and, if so, whether the requested relief is the 'functional equivalent' of a form of legal relief against the state that would otherwise be barred by the Eleventh Amendment."  164 F.3d at 971-72 (citing *ANR Pipeline Co. v. LaFaver*, 150 F.3d 1178, 1190-91, 1193-94 (10th Cir. 1998)).

But after the Supreme Court's intervening decision in *Verizon*, which made clear that all *Coeur d'Alene* stands for is the "straightforward inquiry" test, that holding of *MacDonald* is no longer good law.  In fact, the Tenth Circuit overruled the part of *ANR Pipeline* cited by the *MacDonald* Court, explaining that *Verizon* "abrogated" the case-specific "special sovereignty interests" inquiry.  *Hill*, 478 F.3d at 1259.  This Court should skip the *MacDonald*/*ANR Pipeline* analysis and continue directly to the "straightforward inquiry," as outlined above.[4]

---

[4]    It's true that this Court is generally "bound by what [it's] said before."  *RLR Invs., LLC v. City of Pigeon Forge*, 4 F.4th 380, 390 (6th Cir. 2021).  But where "a Supreme Court decision 'mandates modification' of [Sixth Circuit] precedent," the Court should follow the intervening Supreme Court decision (here, *Verizon*).  *Id.* (quoting *United States v. Moody*, 206 F.3d 609, 615 (6th Cir. 2000)).

Sovereignty interests are relevant *only* to the extent they support the *Ex parte Young* "straightforward inquiry." In *Coeur d'Alene*, the "particular and special circumstances" of the case — the state's sovereign interest in its lands or waters and the breadth of the requested relief — supported the Court's finding that *Ex parte Young* did not apply. 521 U.S. at 287. But the facts of *Coeur d'Alene* are uncommon, and successful *Coeur d'Alene* arguments are rare. *See, e.g.*, *Severance*, 566 F.3d at 495; *Arnett*, 281 F.3d at 568; *Duke Energy Trading & Marketing, LLC v. Davis*, 267 F.3d 1042, 1053 (9th Cir. 2001). For example, this Court rejected a *Coeur d'Alene* argument in *Dubuc* because the plaintiff was challenging the denial of his application to practice law, not rights relating to the state's sovereign interests in its lands or waters. 342 F.3d at 617.

And in *Duke Energy*, the Ninth Circuit emphasized the "factual uniqueness" of *Coeur d'Alene* in dismissing a *Coeur d'Alene* challenge to an electric utility company's claim. 267 F.3d at 1053. The Governor of California had commandeered contracts to buy power output, and an electric company sued, claiming that the Governor's actions were preempted by federal law. The company sought only "an injunction

against a specific executive order in an area preempted by federal law." *Id.* That relief would not "permanently divest the Governor of his future ability to invoke his . . . powers or remove an entire area over which he could previously use his powers, such as California's intrastate electricity supply," so *Coeur d'Alene* plainly did not apply. *Id.*

Governor Whitmer and Director Eichinger have not shown that this case would at all threaten Michigan's special sovereign interests in submerged bottomlands. As in *Duke Energy*, granting prospective relief here would not "permanently divest" the state of its property rights "or remove an entire area over which [it] could previously use [its] powers." 267 F.3d at 1053. Unlike the relief requested in *Coeur d'Alene*, which would have transferred the rights of ownership to the Tribe, the relief requested here would not divest Michigan of ownership of the submerged bottomlands.

## CONCLUSION

This Court should affirm the decision below.

Respectfully submitted,

/s/ David R. Jury
David R. Jury, General Counsel
UNITED STEELWORKERS
60 Boulevard of the Allies
Room 807
Pittsburgh, PA 15222
(412) 562-2545
djury@usw.org

*Counsel for United Steelworkers*

/s/ Jacob J. Demree
Jonathan D. Newman
Jacob J. Demree
SHERMAN DUNN, P.C.
900 Seventh St., N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com
demree@shermandunn.com

*Counsel for NABTU*

November 22, 2024

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Rule 29(a)(5) because, excluding the parts of the document exempted by Rule 32(f) and Local Rule 32(b)(1), it contains 5,718 words.

2. This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Century Schoolbook font and fourteen-point type.

/s/ Jacob J. Demree
Jacob J. Demree
SHERMAN DUNN, P.C.
900 Seventh St., N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
demree@shermandunn.com

# CERTIFICATE OF SERVICE

I certify that on November 22, 2024, this brief was filed using the Court's CM/ECF system. All attorney participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Jacob J. Demree
Jacob J. Demree
SHERMAN DUNN, P.C.
900 Seventh St., N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
demree@shermandunn.com